[Cite as *State v. Daniels*, 2026-Ohio-3050.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

State of Ohio

        Appellee

v.

Rontonio Daniels

        Appellant

Court of Appeals No.  {22}E-25-023

Trial Court No.  2021 CR 0393


**<u>DECISION AND JUDGMENT</u>**

Decided: August 7, 2026

* * * * *

Kevin J. Baxter, Erie County Prosecuting Attorney, and
Kristin R. Palmer, Assistant Prosecuting Attorney, for appellee.

Kimberly Kendall Corral, for appellant.

* * * * *

**SULEK, J.**

{¶ 1} Appellant Rontonio Daniels appeals the judgment of the Erie County Court of Common Pleas, which convicted him following a no contest plea to seven drug-related offenses.  Daniels argues that the trial court erred when it denied his motion to suppress. For the reasons that follow, the trial court's judgment is reversed, and the matter is remanded for further proceedings.

### I. Factual Background and Procedural History

{¶ 2} This matter involves the denial of Daniels' motion to suppress evidence that was seized (1) from his person incident to arrest, and (2) from the residence at 617 Broadway Street, Sandusky, Ohio.

**{¶ 3}** The facts taken from the suppression hearing reveal that in 2020, the Sandusky Police Department utilized a confidential source, later identified as R.B., to conduct several controlled drug buys from Daniels. The controlled buys occurred on November 5, November 12, and November 20, 2020, respectively. The first buy occurred at 617 Broadway Street where Daniels sometimes resides with his girlfriend A.L. The second two buys occurred at the Circle K on Washington Street, Sandusky Ohio. In each instance, the Sandusky Police Department monitored R.B.'s phone activity as he set up the transaction, searched R.B. for drugs and money before the transaction, gave him pre-recorded buy money, conducted video and/or audio surveillance of him at all times before, during, and after the transaction, received the drugs from R.B. after the transaction, and searched again to ensure that R.B. did not have any other drugs or money on his person or in his vehicle.

**{¶ 4}** A fourth controlled drug buy was arranged for December 16, 2020. On that date, officers observed R.B. place recorded and monitored phone calls to Daniels seeking to purchase 4.5 ounces of powder cocaine. Surveillance units then observed Daniels drive to 617 Broadway Street, exit the vehicle with it still running, go inside the residence, exit the residence a short time later, and drive to Circle K. Upon his arrival at Circle K, Daniels was arrested by the police. A search incident to the arrest uncovered a large amount of suspected cocaine in Daniels' jacket pocket. After police advised him of his *Miranda* rights, Daniels stated the cocaine was "four," presumably meaning four ounces.

2.

{¶ 5} Daniels was arrested at 6:25 p.m. on December 16, 2020. Former Sandusky Police Detective Darian Cook testified that he went straight from Daniels' arrest to the police department where he completed the warrant affidavit. Cook explained that several officers had been working on the warrant affidavit throughout the investigation, inputting information as the drug buys were completed. He estimated that it took "maybe an hour" to finish it by adding the events from that day. In fact, the search warrant for the residence at 617 Broadway Street was issued 48 minutes after the arrest, at 7:13 p.m.

{¶ 6} While Cook was preparing the search warrant affidavit, other officers went to 617 Broadway Street and secured the residence, believing that evidence might be at risk of being destroyed. When they arrived, three juveniles at the residence let them inside. One of the juveniles, a teenage girl who was A.L.'s daughter, testified at the suppression hearing that the officers stated that she must open the door or they would knock it down. The officers then conducted a sweep of the residence for officer safety, during which they broke open a locked bedroom door. The juveniles informed the officers that the bedroom was used by Daniels and that he went into the bedroom just prior to leaving the house a short time earlier. Inside the bedroom, the officers noticed a white powdery substance on top of the dresser in plain view. The officers then sat with the juveniles in the living room awaiting the search warrant. Once the search warrant was issued, the officers searched the residence, finding cocaine in a nightstand and in a safe in the master bedroom.

{¶ 7} Relevant here, the search warrant affidavit detailed the circumstances of the three completed controlled buys and the arranged but uncompleted fourth controlled buy.

3.

It further described that the confidential source has shown to be reliable and has "provided information pertaining to this investigation and another investigation that was able to be corroborated and proven to be reliable. The confidential source has provided information in another narcotics investigation that led to the seizure of a large amount of cocaine, heroin, United States Currency and a firearm." In addition, it stated that officers had secured 617 Broadway Street and had observed a white powdery substance on top of a dresser while clearing the residence.

{¶ 8} Not included in the search warrant affidavit was information that the confidential source was himself engaged in drug trafficking in Ottawa County, Ohio. Notably, on the date Daniels was arrested, police were executing a search warrant at the confidential source's residence. Police had also executed a search warrant at that residence several days earlier on December 4, 2020. The confidential source was indicted on drug charges in January 2021.

{¶ 9} Daniels moved to suppress the evidence seized from his person and from the residence, which the State opposed.

{¶ 10} Specifically, Daniels moved to suppress the evidence seized from his person on the grounds that the police did not have probable cause to effectuate a warrantless arrest. The State responded that the warrantless arrest of Daniels was not unconstitutional because the officers had probable cause to believe that he was engaged in the crime of offering to sell narcotics.

{¶ 11} As for the evidence seized from the residence, Daniels argued that no exigent circumstances existed to justify the warrantless entry. He maintained that the

4.

officers' belief that evidence might imminently be destroyed was unreasonable because Daniels was already in police custody and his girlfriend, A.L., was not home. Furthermore, he argued that the search warrant was invalid because it materially omitted information regarding the confidential source's credibility, namely that the confidential source was himself trafficking in drugs.

{¶ 12} In its response, the State argued that law enforcement did not make an unlawful entry but were allowed in by the juveniles. The State, however, acknowledged that if law enforcement had not been allowed in, the officers would have entered anyway to prevent the potential imminent destruction of evidence. It asserted that Sandusky is a small community and Daniels' arrest in a public place would have been known in a very short period of time, and it suggested that someone would have called the residence with instructions to destroy the evidence. Once inside the residence, the State asserted that law enforcement did not search the residence beyond what was in plain view. Finally, the State argued that the search warrant was constitutionally valid, and the confidential source's separate drug activity did not impact his credibility with respect to the present investigation, all of which was independently monitored by law enforcement.

{¶ 13} Following the suppression hearing, the trial court entered its judgment denying Daniels' motion to suppress.

{¶ 14} As to the evidence seized incident to Daniels' arrest, the trial court found that the officers had probable cause to believe that Daniels had committed a felony by offering to sell drugs to R.B. as detailed in the monitored communication.

5.

{¶ 15} As to the evidence seized from the residence, the trial court found that law enforcement did not have voluntary consent to enter the residence. However, it also found that the exigent circumstance of the potential imminent destruction of evidence justified the officers' entry. It reasoned that law enforcement had an objectively reasonable basis for concluding that evidence would be destroyed because Daniels' arrest occurred in a public place near surrounding buildings that housed known drug dealers, and therefore A.L. or other third parties would have been alerted about the arrest and may have attempted to destroy evidence in order to protect Daniels. It further reasoned that, once inside, the officers had an objectively reasonable concern for officer safety that permitted them to break open the locked bedroom door. The trial court also found that the security sweep of the premises did not constitute a search, and officers waited until the search warrant was issued to search the residence.

{¶ 16} Finally, the trial court found that the search warrant was constitutionally valid. It reasoned that even if the affiant had omitted information pertaining to the confidential source's credibility with reckless disregard of whether it would make the affidavit misleading, the omission did not render the content in the affidavit insufficient to establish probable cause. The trial court noted that there was no evidence that the confidential source acted improperly during the controlled buys, and none of the confidential source's separate criminal activity was intertwined with his actions in the present investigation. In addition, all of the confidential source's activity was monitored and supervised by law enforcement. Thus, the affiant's description of the circumstances

of the controlled buys was sufficient to establish probable cause to believe that evidence of drug trafficking would be found at 617 Broadway Street.

{¶ 17} Following the denial of his motion to suppress, Daniels entered a plea of no contest to the indictment and was found guilty. He was sentenced to an indefinite term of 20 to 25 1/2 years in prison.

## II. Assignments of Error

{¶ 18} Daniels timely appeals his conviction, asserting three assignments of error for review:

> 1. The trial court erred by failing to grant the motion to suppress as the Sandusky Police Department entered the home located at 617 Broadway Street absent a search warrant and without a valid exception to the warrant requirement.
>
> 2. The trial court erred by failing to grant the motion to suppress as the judge issuing the search warrant was misled by false information, material omissions, and information provided with reckless disregard for the truth concerning the informant's reliability such that the warrant was issued without probable cause.
>
> 3. The trial court erred by failing to suppress all evidence illegally taken from the appellant's person during his warrantless arrest.

## III. Analysis

{¶ 19} In his first and second assignments of error, Daniels challenges the trial court's denial of his motion to suppress evidence seized from the search of 617 Broadway Street. Those assignments of error will be addressed together, but separately from his third assignment of error challenging the denial of his motion to suppress evidence seized incident to his arrest. For ease of discussion, this court will address Daniels' third assignment of error first.

7.

## A. Standard of Review

{¶ 20} The Fourth Amendment to the United States Constitution guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." Article I, Section 14 of the Ohio Constitution is nearly identical and "affords the same protection in felony cases." *State v. Eatmon*, 2022-Ohio-1197, ¶ 27; *State v. Ruffin*, 2024-Ohio-5626, ¶ 26 (6th Dist.).

{¶ 21} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 2003-Ohio-5372, ¶ 8; *State v. Parks*, 2026-Ohio-1629, ¶ 23 (6th Dist.). "When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *Id.*, citing *State v. Mills*, 62 Ohio St.3d 357, 366 (1992). "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Id.*, citing *State v. Fanning*, 1 Ohio St.3d 19 (1982). "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706 (4th Dist. 1997).

## B. Search Incident to Arrest

{¶ 22} In his third assignment of error, Daniels argues that the trial court erred when it denied his motion to suppress evidence seized from his person incident to his arrest.

8.

{¶ 23} The "search incident to arrest" exception to the warrant requirement allows officers "to conduct a search that includes an arrestee's person and the area within the arrestee's immediate control." *State v. Smith*, 2009-Ohio-6426, ¶ 11, citing *Chimel v. California*, 395 U.S. 752, 762-763 (1969). "This exception 'derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations.'" *Id.*, quoting *Arizona v. Gant*, 556 U.S. 332, 338 (2009).

{¶ 24} Daniels argues that the search was improper because law enforcement did not have probable cause to arrest him. "Probable cause is 'defined in terms of facts and circumstances "sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense."'" *State v. Jordan*, 2021-Ohio-3922, ¶ 19, quoting *Gerstein v. Pugh*, 450 U.S. 103, 111-112 (1975), quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964). "When a warrantless arrest is challenged on constitutional grounds, the court must determine whether the facts known to the officers at the time of the arrest would '"warrant a man of reasonable caution in the belief" that an offense has been committed.'" *Id.*, quoting *Beck* at 96, quoting *Carroll v. United States*, 267 U.S. 132, 162 (1925).

{¶ 25} In this case, at the time of the arrest, law enforcement had observed three prior controlled drug buys with Daniels as the seller. They had further observed R.B. arrange with Daniels for a fourth drug sale of four ounces of cocaine, and they surveilled Daniels as he traveled to 617 Broadway Street—where the first controlled drug buy occurred—and then to the agreed-upon site for the transaction. Based upon these facts,

9.

law enforcement had probable cause to believe that Daniels had committed and was committing the offense of offering to sell narcotics.

{¶ 26} Alternatively, Daniels maintains that the warrantless arrest was improper because law enforcement had time to obtain an arrest warrant. The Ohio Supreme Court, however, has consistently held that "[a] warrantless arrest that is based upon probable cause and occurs in a public place does not violate the Fourth Amendment." *Jordan* at ¶ 2. "[N]either a showing of exigent circumstances nor a showing of the impracticability of obtaining an arrest warrant is necessary to sustain the constitutionality of a warrantless arrest under either the United States Constitution or the Ohio Constitution." *Id.* Here, the arrest occurred with probable cause and in the public place of a convenience store parking lot. Therefore, law enforcement was not required to first obtain an arrest warrant.

{¶ 27} Accordingly, because law enforcement had probable cause to believe that Daniels committed an offense, the warrantless arrest of Daniels in a public place, and the subsequent search incident to that arrest, did not violate his constitutional rights. The trial court did not err in denying his motion to suppress evidence seized from his person. Daniels' third assignment of error is not well-taken.

### C. Search of 617 Broadway Street

{¶ 28} In his first assignment of error, Daniels argues that the evidence seized from 617 Broadway Street must be suppressed because the officers unconstitutionally entered the residence and conducted a search without a warrant.

10.

{¶ 29} Importantly, at the outset, this court must address the factual sequence of events. Daniels relies upon his interpretation that once inside, the officers conducted a single, continuous, and uninterrupted search that began without a warrant. The trial court, however, differentiated between the initial protective sweep and the search conducted pursuant to the warrant. Specifically, it noted that "law enforcement secured the inside of the residence and thereafter waited for a search warrant, which was approximately forty-five minutes after defendant's arrest, to search the residence."

{¶ 30} Supporting the trial court's finding was Cook's testimony that he prepared the affidavit for the warrant and was informed that the residence was secured and the officers were waiting to have the search warrant signed. He then arrived at the residence, provided a copy of the search warrant to A.L., and the search warrant was executed. Cook acknowledged, though, that once he received the signed warrant, he relayed that information to officers at the residence. Thus, the search may have commenced before his arrival but not until after the warrant was signed.

{¶ 31} Cook did very little searching himself. Instead, he documented and maintained an inventory of items that were found by the other officers. The inventory included cocaine and U.S. currency that were found in a safe and nightstand in the master bedroom. Additionally, U.S. currency was found in a plastic container in the bedroom, and a digital scale and spoon with residue were found on the nightstand. Cook testified that he was present when the master bedroom was searched and the safe was opened, which would have necessarily occurred after the warrant was issued.

11.

{¶ 32} In addition to Cook's testimony, Sandusky Police Detective Ronald Brotherton stated that he helped secure the residence to ensure that no evidence was destroyed prior to being able to search the house pursuant to a search warrant. He described that they walked through each room looking for people that could harm them. While performing the security sweep, officers observed a white powdery substance in plain view on the nightstand of the master bedroom. Once all the rooms were checked, the officers sat with the juveniles until the warrant was signed. Brotherton testified that he did not search any portion of the home for any contraband prior to the search warrant being executed.

{¶ 33} The testimony of Cook and Brotherton constitutes competent, credible evidence to support the trial court's finding that the protective sweep and the search were two separate events. This court, therefore, must accept as true that officers entered 617 Broadway Street without a warrant, performed a security sweep of the premises during which they discovered a white powdery substance on the nightstand in plain view, then waited with the juveniles until the search warrant was signed, at which time they began a search of the residence that revealed the cocaine and U.S. currency located in the safe and nightstand of the master bedroom.

{¶ 34} Under these facts, the issue before this court is whether the evidence recovered following the execution of the search warrant must be suppressed.

{¶ 35} "The suppression or exclusionary rule is a judicially prescribed remedial measure and as 'with any remedial device, the application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served.'"

12.

*Segura v. United States*, 468 U.S. 796, 804 (1984), quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974). "[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure . . . but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" *Id.*, quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939). It is, however, "well established" that "evidence is not to be excluded if the connection between the illegal police conduct and the discovery and seizure of the evidence is 'so attenuated as to dissipate the taint.'" *Id.* at 805, quoting *Nardone* at 341. "[T]he exclusionary rule has no application [where] the Government learned of the evidence 'from an independent source.'" *Id.*, quoting *Wong Sun v. United States*, 371 U.S. 471, 487 (1963), quoting *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920).

{¶ 36} Daniels first argues that the evidence should be suppressed because no exigent circumstances justified the officers' warrantless entry into the residence, and therefore any evidence later discovered was "fruit of the poisonous tree."

{¶ 37} "It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984), quoting *United States v. United States District Court*, 407 U.S. 297, 313 (1972). "It is not surprising, therefore, that the Court has recognized, as 'a "basic principle of Fourth Amendment law[,]" that searches and seizures inside a home without a warrant are presumptively unreasonable.'" *Id.* at 748-749, quoting *Payton v. New York*, 445 U.S. 573, 586-587 (1980). The *Welsh* court recognized that "exceptions to the warrant requirement are 'few in number and carefully delineated,' . . . and that the police

13.

bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests." *Id.* at 749-750, quoting *United States District Court* at 318.

{¶ 38} One of those exceptions is the prevention of the imminent destruction of evidence. *State v. Moore*, 90 Ohio St.3d 47, 52 (2000), citing *Cupp v. Murphy*, 412 U.S. 291, 294-296 (1973); *Kentucky v. King*, 563 U.S. 452, 460 (2011). "A warrantless entry to prevent the destruction of evidence is justified if the government demonstrates: '(1) a reasonable belief that third parties are inside the dwelling; and (2) a reasonable belief that these third parties may soon become aware the police are on their trail, so that the destruction of evidence would be in order.'" *State v. Enyart*, 2010-Ohio-5623, ¶ 21 (10th Dist.), quoting *United States v. Lewis*, 231 F.3d 238, 241 (6th Cir. 2000), quoting *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1512 (6th Cir. 1988); *State v. Reilly*, 2020-Ohio-850, ¶ 15 (3d Dist.); *State v. Striks*, 2015-Ohio-1401, ¶ 32 (2d Dist.); *State v. Norman*, 2014-Ohio-5084, ¶ 51 (12th Dist.); *State v. West*, 2006-Ohio-4267, ¶ 18 (8th Dist.). "The police must have an objectively reasonable basis for their belief that evidence will be lost or destroyed—the 'mere possibility of the loss or destruction of evidence is an insufficient basis for the warrantless entry of a house to prevent the destruction of evidence.'" *United States v. Ukomadu*, 236 F.3d 333, 337 (6th Cir. 2001), quoting *United States v. Radka*, 904 F.2d 357, 363 (6th Cir. 1990); *Enyart* at ¶ 21; *Norman* at ¶ 52; *West* at ¶ 18. The burden to establish an exception to the warrant requirement falls on the State. *State v. Wintermeyer*, 2019-Ohio-5156, ¶ 18.

14.

{¶ 39} The State argues that the officers had an objectively reasonable belief that evidence would be destroyed because Daniels was arrested in public at a gas station near a multi-unit development where other known drug dealers reside, those drug dealers knew Daniels well and would have likely tipped off others that he had been arrested, and——given the close proximity between the gas station and the residence—nearby third-parties could quickly go to destroy evidence. The State maintains in this case that the officers did not know whether A.L. or anyone else was at the residence when they initially arrived, but they learned the house was not empty when they saw two of the juveniles through the back door before being let inside. Notably, the visible juveniles were two girls around 13 years of age.

{¶ 40} In support of its position, the State cites *State v. Mitchell*, 2007-Ohio-3896, ¶ 32-33 (8th Dist.) in which the Eighth District held that exigent circumstances justified a warrantless entry into an apartment. In that case, officers were concerned that with word out on the street about a raid of one drug house, the tenant of an associated apartment who was still "at large" would try to remove or destroy evidence if he was in that apartment. *Id.* at ¶ 32.

{¶ 41} *Mitchell* is distinguishable from the present situation. There, the whereabouts of the tenant of the associated apartment were unknown, and it was possible that the tenant was still in the apartment. Here, despite the State claiming that the police did not know whether A.L. was at home, Brotherton testified that he knew what vehicle A.L. drove, and he knew that her vehicle was not at the house, thus giving the police reason to believe that she was not at home.

15.

{¶ 42} Furthermore, the State's theory of the potential destruction of evidence rests on a number of assumptions. One must assume (1) that Daniel's arrest was observed by other drug dealers, (2) that those drug dealers had the ability to contact someone other than A.L. inside 617 Broadway Street, given that A.L.'s vehicle was not present, and (3) that the contacted individuals would readily destroy the evidence. Nothing in the record exists to support these assumptions. In addition, the record is silent as to any known associates other than A.L., or as to any loud noises or commotion coming from the residence that would indicate the occupants were aware of the officers' presence and were attempting to destroy evidence. *Compare Reilly* at ¶ 17 (exigent circumstances existed where officers heard voices inside indicating that someone knew people were outside, and heard scurrying or people moving abruptly throughout the residence) *and Striks* at ¶ 34 (exigent circumstances where officers knew defendant was in the apartment because she slammed and locked the door when she realized officers were outside and where one of the officers informed the defendant he detected the odor of burnt marijuana and requested consent to search, which she refused) *with Norman* at ¶ 53 (no exigent circumstances where officers did not hear any noises and did not think anyone was in the basement where the suspected marijuana was) and *West* at ¶ 19 (no exigent circumstances where there was no indication the occupants were aware that the officers knew of the drugs).

{¶ 43} In sum, the officers in this case did not have an objectively reasonable basis for their belief that evidence would be destroyed and instead acted on the possibility that evidence could be destroyed. The Fourth Amendment requires more than a mere

16.

unsubstantiated possibility of the destruction of evidence to dispatch with the warrant requirement. The trial court therefore erred when it held that exigent circumstances justified the officers' initial entry into 617 Broadway Street.

{¶ 44} This, however, does not end the inquiry into whether the evidence seized from the subsequent search must be suppressed. In his appellate brief, Daniels discusses *Segura v. United States*, 468 U.S. 796, 804 (1984) and the independent source doctrine, recognizing that the doctrine applies "when the police carry out an initial illegal search followed by a second search pursuant to a valid warrant that is untainted by the initial unlawful entry."[1]

{¶ 45} *Segura* involved a situation that is directly analogous to the present one. In that case, law enforcement suspected that Segura and his partner Colon were trafficking cocaine from their apartment in New York. While conducting surveillance, members from the drug enforcement task force observed the two execute a drug transaction. Later that evening, task force agents arrested Segura in the lobby of his apartment building. The agents then took Segura to his apartment and knocked on the door. When Colon opened the door, the agents entered the apartment without requesting or receiving permission. They conducted a limited security check of the apartment during which they observed various drug paraphernalia in plain view. Both Colon and Segura were then taken into custody at the Drug Enforcement Administration headquarters. Two agents

---

[1] The State, for its part, did not address the independent source doctrine either in the trial court or on appeal.

17.

remained inside the apartment awaiting a search warrant. Because of an administrative delay, however, the search warrant was not issued until 19 hours later. Upon execution of the search warrant, the agents discovered and seized cocaine and records of narcotics transactions. They also seized the evidence that was discovered in plain view. *Segura* at syllabus.

{¶ 46} In the district court, Segura and Colon moved to suppress all the evidence seized from their apartment. The district court granted the motion, finding that there were no exigent circumstances that justified the initial warrantless entry into the apartment, and that the evidence seized was the "fruit" of an illegal search. *Id.* at 801-802. On appeal, the court of appeals affirmed that the initial warrantless entry was not justified by exigent circumstances and upheld the suppression of the evidence discovered in plain view during that entry. It, however, reversed the district court with respect to the evidence that was discovered and seized pursuant to the search warrant, holding that that evidence should not be suppressed. *Id.* at 802-803.

{¶ 47} The matter was accepted by the United States Supreme Court on the issue of "whether drugs and the other items not observed during the initial entry and first discovered by the agents the day after the entry, under an admittedly valid search warrant, should have been suppressed." *Id.* at 804. The Supreme Court specifically noted that the government had not sought review regarding the propriety of the warrantless entry or the district court's decision to suppress the evidence that was observed in plain view during that entry, and therefore those issues would not be addressed. *Id.*

18.

{¶ 48} Analyzing the issue before it, the Supreme Court concluded that "[w]hether the initial entry was illegal or not is irrelevant to the admissibility of the challenged evidence because there was an independent source for the warrant under which that evidence was seized," and "[e]xclusion of evidence as derivative or 'fruit of the poisonous tree' is not warranted here because of that independent source." *Id.* at 813-814. It reasoned that "[n]one of the information on which the warrant was secured was derived from or related in any way to the initial entry into petitioner's apartment; the information came from sources wholly unconnected with the entry and was known to the agents well before the initial entry. No information obtained during the initial entry or occupation of the apartment was needed or used by the agents to secure the warrant." *Id.* at 814. The United States Supreme Court therefore held that the valid warrant provided an independent source for the challenged evidence where the warrant was secured based on information from "sources wholly unconnected with the initial entry and [that] was known to the agents well before that entry," such that the exclusion of the evidence was not warranted as "fruit of the poisonous tree." *Id.* at 797.

{¶ 49} Several years later, the United States Supreme Court addressed the undiscussed issue in *Segura* concerning the suppression of evidence that was observed in plain view during an initial, warrantless entry. In *Murray v. United States*, 487 U.S. 533 (1988), syllabus, the Supreme Court held that "[t]he Fourth Amendment does not require the suppression of evidence initially discovered during police officers' illegal entry of private premises, if that evidence is also discovered during a later search pursuant to a valid warrant that is wholly independent of the initial illegal entry."

19.

{¶ 50} In *Murray*, federal law enforcement agents surveilled Murray and another individual drive two vehicles into a warehouse in South Boston. Twenty minutes later, they drove the vehicles out of the warehouse. As they drove out, the agents observed inside the warehouse two individuals and a tractor-trailer rig with a long, dark container. The vehicles were later stopped and lawfully seized. Both vehicles were found to contain marijuana. *Id.* at 535.

{¶ 51} With this information, several agents forced entry into the warehouse without a warrant. *Id.* The warehouse was unoccupied, but the agents observed "numerous burlap-wrapped bales that were later found to contain marijuana." *Id.* They left without disturbing the bales, continued to surveil the warehouse, and did not re-enter until they received the search warrant. In applying for the warrant, the agents did not mention the prior entry and did not rely on any observations made during that entry. *Id.* at 535-536. Upon execution of the search warrant, the agents seized "270 bales of marijuana and notebooks listing customers for whom the bales were destined." *Id.* at 536.

{¶ 52} In the district court, Murray moved to suppress the evidence found in the warehouse, arguing that the warrant was invalid because the agents did not inform the magistrate about their prior warrantless entry. *Id.* The district court denied his motion and the court of appeals affirmed. The United States Supreme Court accepted review to determine whether, "assuming evidence obtained pursuant to an independently obtained search warrant, the portion of such evidence that had been observed in plain view at the time of a prior illegal entry must be suppressed." *Id.* at 535.

20.

**{¶ 53}** In its analysis, the Supreme Court described the "independent source" doctrine as follows:

> "[T]he interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse*, position that they would have been in if no police error or misconduct had occurred….When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation."

(Emphasis sic.) *Id.* at 537, quoting *Nix v. Williams*, 467 U.S. 431, 443 (1984).

**{¶ 54}** Applying that doctrine to the facts before it, the Supreme Court reasoned, "Knowledge that the marijuana was in the warehouse was assuredly acquired at the time of the unlawful entry. But it was also acquired at the time of entry pursuant to the warrant, and if that later acquisition was not the result of the earlier entry there is no reason why the independent source doctrine should not apply." *Id.* at 541. "Invoking the exclusionary rule would put the police (and society) not in the *same* position they would have occupied if no violation occurred, but in a *worse* one." (Emphasis sic.) *Id.* It concluded, "So long as a later, lawful seizure is genuinely independent of an earlier, tainted one (which may well be difficult to establish where the seized goods are kept in the police's possession) there is no reason why the independent source doctrine should not apply." *Id.* at 542.

**{¶ 55}** In that case, however, the United States Supreme Court determined that a question existed on the ultimate issue of "whether the search pursuant to the warrant was in fact a genuinely independent source of the information and tangible evidence at issue here. This would not have been the case if the agents' decision to seek the warrant was

21.

prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant." *Id.* It recognized that although the district court found that the agents did not include any of their observations from the warehouse in the search warrant affidavit, it did not explicitly find that the agents would not have sought a warrant if they had not earlier entered the warehouse. *Id.* at 543. It therefore remanded the matter to the district court to determine "whether the warrant-authorized search of the warehouse was an independent source of the challenged evidence in the sense we have described." *Id.* at 543-544.

{¶ 56} Thus, "evidence observed by police during an illegal entry need not be excluded if the evidence is later discovered during the execution of a valid search warrant issued on information wholly unconnected to the prior entry." *State v. Carter*, 69 Ohio St.3d 57, 68 (1994). For the evidence to not be suppressed, the State must establish that "(1) no information presented in the affidavit for the warrant was seen during the initial entry, and (2) the agents' decision to seek the warrant was not prompted by what they had seen during the initial entry." *Id.*; *see also United States v. Williams*, 656 Fed.Appx. 751, 753 (6th Cir. 2016). "[T]he simple fact that an application for a warrant contains information obtained from an illegal search does not by itself signify that the independent source doctrine does not apply." *United States v. Jenkins*, 396 F.3d 751, 758 (6th Cir. 2005). "If the application for a warrant 'contains probable cause apart from the improper information, then the warrant is lawful and the independent source doctrine applies, providing that the officers were not prompted to obtain the warrant by what they

22.

observed during the initial entry." *Id.*, quoting *United States v. Herrold*, 962 F.2d 1131, 1141-1142 (3d Cir. 1992). "[F]or evidence to be inadmissible due to the government's failure to collect it via an independent source, the tainted information presented to the judge must affect the judge's decision in a *substantive*, meaningful way." (Emphasis sic.) *Id.*

{¶ 57} Two cases from the Eighth District illustrate how the independent source doctrine has been applied in circumstances like those before this court.

{¶ 58} In *State v. Williams*, 2000 WL 426562 (8th Dist. Apr. 20, 2000), the Eighth District upheld the trial court's decision to suppress evidence that was seized pursuant to a search warrant. In that case, FBI agents entered Williams' motel room without a warrant and questioned him regarding a bank robbery. A second individual, Democko, was also in the motel room. During separate questioning by the FBI agents, Democko admitted that he had just purchased two pounds of marijuana from Williams, and he stated that more drugs and currency remained in the room. *Id.* at *1-2. The agents were not concerned about the drugs and turned the matter over to the Warrensville Heights Police department. *Id.* at *2. Officer Waggoner obtained a search warrant for the motel room based on the information provided by the FBI agents. *Id.* When the search warrant was executed, officers discovered $13,000 in cash and approximately 20 pounds of marijuana. *Id.*

{¶ 59} Prior to trial, Williams moved to suppress the evidence that was seized pursuant to the warrant. The trial court granted Williams' motion and suppressed the evidence, finding that the FBI agents violated Williams' Fourth Amendment rights when

23.

they entered the motel room without a warrant. Furthermore, it found that the State failed to present evidence that the information in the search warrant affidavit was acquired from an independent source. *Id.* at *3.

{¶ 60} On appeal, the Eighth District determined that the independent source exception to the exclusionary rule did not apply. It noted that "the information presented in the affidavit for the warrant is based wholly on the information gained from the F.B.I. agents' unlawful entry into Williams' motel room. Further, the Warrensville Heights police officer's decision to seek the warrant was prompted only by the information gained from the F.B.I. agents." *Id.* at *6. It therefore affirmed the trial court's suppression of the evidence that was the indirect product of the F.B.I.'s unconstitutional entry. *Id.*

{¶ 61} In contrast, in *State v. Parker*, 2011-Ohio-1059 (8th Dist.), the Eighth District affirmed the trial court's denial of the defendant's motion to suppress evidence seized pursuant to a search warrant. There, detectives had initiated a controlled purchase of several pounds of marijuana from a co-defendant, Moore. They later arrested Moore and found various items, including a rent receipt for a warehouse. Officers then sought a search warrant for the warehouse and for Moore's residence, which previously belonged to Parker. *Id.* at ¶ 2-3.

{¶ 62} As the officers waited for the search warrants to be approved, they used Moore's keys to enter both the warehouse and the residence to ensure that no one was inside. *Id.* at ¶ 4. At the warehouse, two detectives entered to secure the premises and to do a sweep for occupants because they noticed a light was on inside and two vehicles

24.

were parked close to the entrance. They confirmed no one was inside and left to set up surveillance outside. *Id.* at ¶ 32. After that, a different detective along with two sergeants entered the "labyrinthian" warehouse to locate the rear entrance to set up surveillance on it. While inside, one of the sergeants found a shoe box containing a large sum of money in an office. *Id.* at ¶ 33. At the residence, officers conducted a sweep to determine that no one was inside destroying evidence. They then exited the residence and set up surveillance outside. *Id.* at ¶ 34. The subsequent searches pursuant to the search warrants revealed nearly $400,000 in cash, marijuana, drug ledgers, packing materials, guns, ammunition, and a bullet-proof vest. *Id.* at ¶ 4.

{¶ 63} In ruling on Parker's motion to suppress the evidence that was seized during the searches, the trial court found that the second entry into the warehouse and the entry into the residence were unconstitutional. *Id.* at ¶ 38. Nonetheless, the trial court concluded that the evidence should not be suppressed because "[t]he search warrants were not premised on any information or observation made by officers when they entered the two locations, but rather, probable cause was established from independent sources." *Id.* at ¶ 39. The Eighth District affirmed the trial court's judgment, reasoning, "The documents used to obtain [the] warrants did not rely on information gained from the entries, but were based on the police investigation conducted prior to entry. The evidence used to establish probable cause for the warrants was obtained from the prior controlled buy and information from Moore and his vehicle following his arrest." *Id.* at ¶ 45.

{¶ 64} This court likewise has addressed a similar situation in *State v. Jordan*, 2021-Ohio-4402 (6th Dist.). In *Jordan*, a postal inspector intercepted a package that

25.

contained narcotics. Pursuant to a federal warrant, law enforcement opened the package and placed a tracking device and light sensor inside. Both items were large and would be "very visible" once the package was opened. *Id.* at ¶ 8-9. The postal inspector hand delivered the package to a female recipient, who within minutes placed it into her car and drove to a residence in Toledo, Ohio. *Id.* at ¶ 12. At the Toledo residence, the package was opened, triggering an alert to law enforcement. *Id.* Officers then entered the residence without a warrant to prevent the narcotics from being destroyed. *Id.* at ¶ 13. They secured the residence and awaited a search warrant, which was approved approximately 90 minutes later. *Id.* at ¶ 13, 17. While securing the residence, officers noticed in plain view items used to package, sort, and weigh narcotics. *Id.* at ¶ 20.

{¶ 65} In the trial court, Jordan moved to suppress the evidence that was seized following the execution of the search warrant. The trial court first found that the exigent circumstance justifying the initial warrantless entry into the residence was created by law enforcement. It further found that the State presented no evidence that the narcotics were likely to be destroyed. *Id.* at ¶ 25. It determined, therefore, that the warrantless entry was not proper. *Id.* Nevertheless, the trial court denied the motion to suppress, reasoning that the search warrant was valid. *Id.* at ¶ 26, 28. As part of its determination that the search warrant was valid, the trial court excised three paragraphs from the search warrant affidavit that described the warrantless entry into the residence and the plain view observation of the raw odor of marijuana and "items consistent with the packaging and sale of illegal drugs." *Id.* at ¶ 26. The trial court characterized the excised paragraphs as

26.

"only a small part of the entire search warrant" and determined that the remaining paragraphs established probable cause to search.  *Id.*

{¶ 66} On appeal, this court affirmed the trial court's judgment.  This court agreed with the trial court's probable cause determination even after excluding the officers' observations made during the warrantless entry into the residence.  *Id.* at ¶ 47.  It held that "[s]ince the search of [Jordan's] residence was supported by a valid search warrant, the exclusionary rule does not apply."  *Id.* at ¶ 48, citing *State v. Quinn*, 2012-Ohio-3123, ¶ 20 (12th Dist.).

{¶ 67} Here, although Daniels raised the independent source doctrine below, the trial court did not analyze it, and therefore did not make any findings regarding whether (1) the warrant contains probable cause apart from the information gathered from the initial entry, and (2) whether the officers were prompted to obtain the warrant by what they observed during the initial entry.  As in *Murray*, this court is compelled to remand the matter to the trial court to determine those facts in the first instance.  *Murray* at 543-544; *see also United States v. Rodriguez*, 834 F.3d 937, 943 (8th Cir. 2016); *United States v. Hill*, 776 F.3d 243, 253 (4th Cir. 2015);

{¶ 68} In his first assignment of error, Daniels nonetheless seeks to avoid the doctrine's application entirely by characterizing law enforcement's conduct as one continuous search.  He cites *United States v. Dice*, 200 F.3d 978, 985-986 (6th Cir. 2000), which distinguishes *Segura* as involving a "second search."  In *Dice*, the Sixth Circuit rejected the government's attempted application of the independent source doctrine because "there was but one entry, and it was illegal."  *Id.*  As described above, however,

27.

the trial court found that the initial warrantless entry and the subsequent search pursuant to the warrant were two separate events, and its finding is supported by competent, credible evidence. Daniels' reliance on *Dice* is misplaced.

{¶ 69} Alternatively, in his second assignment of error, Daniels argues that the search warrant was invalid because the issuing judge was misled by false information, material omissions, and information provided with reckless disregard for the truth concerning the informant's reliability. He maintains that the search warrant affidavit falsely stated that R.B. was reliable and materially omitted that R.B. was secretly running his own drug trafficking operation at the same time as he was involved in the controlled buys. Daniels asserts that R.B.'s illegal conduct corrupted the entire investigation and undermined the probable cause determination.

{¶ 70} "[I]n determining whether a search warrant was issued upon a proper showing of probable cause, reviewing courts must examine the totality of the circumstances." *State v. Jones*, 2015-Ohio-483, ¶ 13, citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "The duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." *Id.*, quoting *Gates* at 238-239, quoting *Jones v. United States*, 362 U.S. 257, 271 (1960), *overruled on other grounds*, *United States v. Salvucci*, 448 U.S. 83 (1980). The magistrate must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *State v. George*, 45 Ohio St.3d 325 (1989),

28.

paragraph one of the syllabus. "In conducting any after-the-fact scrutiny of an affidavit submitted in support of a search warrant, trial and appellate courts should accord great deference to the magistrate's determination of probable cause, and doubtful or marginal cases in this area should be resolved in favor of upholding the warrant." *Id.* at paragraph two of the syllabus; *State v. Jones* at ¶ 14.

{¶ 71} Daniels claims that the search warrant affidavit contained false statements. Concerning this, the United States Supreme Court has held:

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

*Franks v. Delaware*, 438 U.S. 154, 155-156 (1978).

{¶ 72} The allegedly false statements identified by Daniels, however, only pertain to R.B.'s credibility. But R.B.'s credibility is not material to the probable cause determination in this case. Here, the search warrant affidavit did not rely on information or hearsay statements provided by R.B. Instead, it detailed the events of three controlled buys and a fourth arranged sale with Daniels as the seller, all of which were observed, monitored, or recorded by law enforcement. The affidavit is thus based on law enforcement's observations of Daniels' conduct, not the credibility of R.B. *See State v. Leavell*, 2016-Ohio-5275, ¶ 14 (6th Dist.) ("[N]either the credibility of the informants nor

29.

the manner in which they came to know that they could purchase drugs from appellant is pertinent when the affiant orchestrated and observed the controlled drug buys.").

{¶ 73} Accordingly, for the reasons stated above, Daniels' first assignment of error is well-taken only to the extent that the trial court erred in finding that exigent circumstances justified the initial warrantless entry into 617 Broadway Street. His second assignment of error is not well-taken. The matter is remanded to the trial court to determine whether the independent source doctrine applies in this case.

### IV. Conclusion

{¶ 74} The judgment of the Erie County Court of Common Pleas is reversed, and the matter is remanded to the trial court for further proceedings consistent with this decision. The State is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment reversed<br>and remanded.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27.


Thomas J. Osowik, P.J.     _____

                                              JUDGE

Gene A. Zmuda, J.    

                                  _____

Charles E. Sulek, J.                               JUDGE
CONCUR.

                                  _____

                                             JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.